IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRACY L. GIFFORD,

                Plaintiff,

    v.

PHH MORTGAGE CORPORATION, d/b/a
COLDWELL BANKER MORTGAGE,

                Defendant.

OPINION AND ORDER

18-cv-260-slc

---

       Plaintiff Tracy Gifford has filed suit against defendant PHH Mortgage Corporation for claiming monetary relief against PHH for misrepresentation (intentional, negligent and strict liability) under Wisconsin law and violations of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, and the Wisconsin Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18. PHH filed a motion to dismiss (dkt. 12) that I denied on November 19, 2019 (dkt. 23). PHH now has filed a motion for summary judgment (dkt. 31), which I am granting.

       Gifford alleges that PHH failed to provide a good faith estimate of the property taxes on the home she purchased and escrowed approximately $2,000 less than it should have to pay her first property tax bill. Gifford contends that because she was under the assumption that the escrow account would cover the entire amount that she owed for taxes, she did not make any further payment and was placed in delinquent status. To account for the tax shortfall, PHH increased her monthly mortgage payment by about $400 for two months and $168.38 thereafter, which subjected Gifford to financial hardship.

       In its motion for summary judgment, PHH renews the arguments that it made in its motion to dismiss. Specifically, PHH contends that: (1) Gifford's TILA claim is barred by the applicable statute of limitations; (2) Gifford's state law misrepresentation claims fail because

PHH's escrow estimate was not a representation of fact; (3) Gifford's misrepresentation claims are barred by the economic loss doctrine; and (4) Gifford is not entitled to relief under Wis. Stat. § 100.18 because she was not was not a member of "the public" during the transaction at issue. As explained below, I conclude that PHH is entitled to summary judgment because Gifford's TILA claim is barred by the one-year statute of limitations and she has failed to show that PHH misrepresented a fact, as she is required to do to succeed on her state law claims.

From the parties proposed findings of fact, I find the following facts to be material and undisputed:

## UNDISPUTED FACTS

### I. The Parties and Some Background

Plaintiff Tracy Gifford resides at 237 Peeso Creek Lane in Mondovi, Wisconsin. Defendant PHH Mortgage Corporation, which does business as Coldwell Banker Mortgage, is incorporated in New Jersey and has its principal place of business there.

On March 25, 2015, Gifford purchased her residence from Western Dairyland Economic Opportunity Council, Inc. To help finance her purchase, Gifford obtained a mortgage loan issued by PHH in the amount of $102,564.00. The mortgage was recorded on April 20, 2015, in the Register of Deeds for Buffalo County, Wisconsin as Document Number 257681.

### II. Mortgage Loan

On December 30, 2014, two Uniform Residential Loan Applications were completed in Gifford's name for an FHA mortgage in the amount of $102,584. (The parties do not say why two applications were completed but one application lists an interest rate of 4% while the other

lists a rate of 3.875%. Dkt. 34, exhs. 12 and 13.) The only signature on the applications is that of PHH employee Jamie Pond, who was Gifford's loan originator. (Pond also described herself as Gifford's "mortgage advisor" and "consultant.") Both loan applications state that the "proposed" monthly payment for real estate taxes is $166.67.

On January 15, 2015, Gifford made an offer to Western Dairyland to purchase the property for $120,000. The offer contained a "Financing Contingency" clause with a maximum initial monthly payment of $794.00, including principal, interest, real estate taxes (equal to 1/12th of the estimated net annual taxes), hazard insurance, and a mortgage insurance premium. Gifford's offer also was contingent on Western Dairyland providing Gifford with a grant in the amount of $4,200 and a loan in the amount of $15,000.

The grant and loan appear to be part of special programs for which Gifford was eligible as a first time home buyer who met certain education and income requirements. The mortgage agreement contains certain restrictions required by the HUD HOME Program. *See* dkt. 34-8.[1]

On January 16, 2015, Pond sent Gifford a letter, acknowledging the recent loan application and asking for more information. On January 29, 2015, Pond sent Gifford "compliance disclosures, including the Good Faith Estimate (GFE)." In a cover letter

---

[1] To establish these and several other facts, Gifford relies on the expert report of Frank Cammarata, a banking consultant who spoke with Gifford and her attorney and reviewed various documents. *See* dkt. 21. This is not a proper way to put evidence into the record. Cammarata can proffer his opinion based on the facts of this case, but the reverse is not true: his report, by itself, does not establish the facts upon which his opinion is based. *Carmichael v. Richards*, 307 F. Supp. 2d 1014, 1017, n.2 (S.D. Ind. 2004). "Quite simply, [plaintiff's expert] has no first hand knowledge of the events surrounding this lawsuit and, therefore, his rendition of the 'facts' is hearsay." *Id.*

To the extent that Gifford's proposed facts are not supported by admissible evidence–such as the loan agreement itself– I have not considered them. *See Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001) (evidence relied on to establish facts for summary judgment must be of type admissible at trial).

All of these things being so, these facts are not material to the resolution of Gifford's claims.

accompanying the disclosures, Pond informed Gifford that "[c]ertain fees on the GFE such as title charges, appraisal fees, and taxes are based on estimates and final charges may vary from scenario to scenario." On February 10, 2015, PHH informed Gifford that she had been preapproved for a loan in the amount of $102,564 with a 30-year term.

On February 17, 2015, Valuation Specialists appraised the property as having a fair market value of $136,000. The appraisal described the property as "C1," which the appraisal defines as "improvements have been very recently constructed and have not previously been occupied." Dkt. 34-17 at 3 and 10.

Also on February 17, 2015, PHH entered a conditional commitment and endorsement of the loan, "estimating" the property's value at $136,000 and monthly taxes in the amount of $95.06. Western Dairyland informed Pond on March 10, 2015, that it would grant Gifford $4,550 toward a down payment and issue Gifford a second mortgage in the amount of $15,000 to assist with the purchase of the property. Based on the above, PHH told Gifford that her monthly payment would be $709.38, which included $95.06 per month for escrow for real estate taxes.

On March 24, 2015, PHH provided Gifford with a "Final Commitment" with the following approved loan terms: a purchase price of $120,000, a total loan amount of $102,564, a "total monthly payment" of $709.38, and an "initial monthly tax escrow payment" of $95.06. A footnote on the line item "initial monthly tax escrow payment" states that "[a]mount indicated is based on information received from outside parties. Although it is believed to be accurate as of the date of this Final Commitment, it is subject to change."

The mortgage loan closed on March 25, 2015. The closing documents included a "Final Truth-In-Lending Disclosure" that listed "Estimated Taxes + Insurance (Escrows)" as $219.72 a month and the "Total Estimated Monthly Payment" as $709.38. The "Initial Escrow Account Disclosure Statement" "estimated" Gifford's city tax escrow to be $1,140.72 a year. The "HUD-1 Settlement Statement" states that 2015 taxes are exempt and that $95.06 per month would be held in reserve for property taxes for six months for a total of $570.36. The form contains two columns comparing the GFE to the HUD-1 charges and specifically identifies the initial deposit for the escrow account—which includes the $95.06 for taxes—as a charge that can change.

(The parties dispute whether Pond or anyone else explained to Gifford at the closing how the tax estimate was calculated, why the tax estimate had changed by the time of the closing, or that the actual tax amount may increase significantly because the estimate was based only on the value of a vacant lot.)

Gifford elected to have PHH pay her property taxes annually on or before December 31 every year thereafter. Although Gifford agreed to provide her annual tax statement for the property to PHH on or before December 20 every year, she never did so.

## III. Calculation of Property Tax Estimate

According to Ronald Casperite, who works as a "Complex Liason" for PHH and testified as PHH's corporate representative, in underwriting a mortgage loan, PHH verifies the borrower's income and debt, the existence of a valid sales agreement, the value of the home to be purchased, and the amount of mortgage and homeowner insurance and real estate taxes to be escrowed. *See* dkt. 36 at 4, 10-11.

Typically, PHH would look at an existing tax bill to estimate real estate taxes. In 2015, PHH also may have used a nationwide computerized program called LoanSpan in conjunction with Desktop Underwriter to estimate property taxes—that program is not specific to Wisconsin. However, Gifford's property was unique because it had been owned by a nonprofit entity and involved a new construction. Prior to her purchase of the property in 2015, $0 in taxes had been levied on the property in 2013, 2014, and 2015.

Casperite is not sure whether LoanSpan was used to calculate the $166.67 monthly estimate for Gifford's property taxes. He also does not know why that amount later changed to $95.06. The tax statements from the county listed a mill rate, and Casperite agrees that it could have been used as one of several means to calculate taxes.

### IV. Increase in Gifford's Property Taxes and Monthly Loan Payment

In a letter dated April 29, 2015, PHH told Gifford that

> Typically, within one year following the purchase of a newly constructed home, a new property tax assessment will take place that considers that value of the land and the new structure. This new assessment may result in a significant increase to your property taxes. . . . We suggest that you check with your real estate agent/builder to compare taxes of similar properties in your neighborhood. This should give you an approximation of what you can expect to pay in taxes.

> Dkt. 34, exh. 28.

Gifford did nothing in response to the letter. (Gifford says that the letter confused her and that PHH had not told her any of these things prior to the closing.) Gifford's monthly payment remained $709.38, from May 1, 2015 through February 1, 2017. In addition, on February 16,

2016, PHH sent Gifford an "Off-Scheduled Escrow Statement" showing an escrow surplus of $1,141.95 and told her that she would receive a check in that amount.

The net taxes (the gross amount minus a school credit) on Gifford's property increased to $3,347 in 2017. The 2016 Real Estate Tax Summary for the property states: $119,600 in improvements were made to the land since 2015; the land value is $17,100; the total value of the property is $136,700; the fair market value of the property is $149,600; and the 2016 property taxes were $3,472.15. On December 21, 2016, PHH sent Gifford a new escrow statement, stating that an escrow shortage of $2,611.19 existed and that her new monthly mortgage payment would be $1,116.40 as of February 1, 2017, if she did nothing. PHH told Gifford that if she paid the escrow shortage by January 20, 2017, her annual payment would increase to only $898.80 on February 1, 2017. Gifford did nothing in response to the statement.

On January 4, 2017, PHH informed Gifford that, as indicated in the December 21, 2016 letter, her monthly loan payment would increase to $1,116.40 on February 1. On February 21, 2017, PHH sent Gifford a new escrow statement showing that her escrow shortage had decreased to $2,174.84. If Gifford did nothing, her monthly mortgage payment would decrease to $1,080.04 on April 1, 2017, but if she paid the escrow shortage, her monthly payment would only be $898.80. (Gifford says that she does not remember receiving the statement.) Gifford did nothing, so on March 2, 2017, PHH informed her that her monthly loan payment would be $1,080.04. Gifford's monthly mortgage payment remained at that amount for another year, or until April 1, 2018.

In 2018, Gifford's net property tax remained about the same: $3,382.32. On February 20, 2018, PHH sent Gifford her annual escrow statement showing an escrow surplus of $351.55. PHH sent her a check for $351.55 and told her that her new monthly mortgage payment would be $877.76 as of April 1, 2018. During this entire period, Gifford never missed a mortgage payment.

On March 8, 2018, Gifford filed this civil lawsuit against PHH in the Circuit Court for the County of Buffalo, Wisconsin. PHH removed the case to this court on April 13, 2018.


## OPINION

### I. Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. "As the 'put up or shut up' moment in a lawsuit, summary judgment requires

a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017).

## II. TILA Claim

Gifford contends that PHH disregarded her stated maximum cap for monthly mortgage payments and failed to provide her with a good faith estimate of her property taxes given the information it had in its possession at the time. In particular, Gifford cites Cammarata's expert report in support of her contention that PHH should have used two statistics contained in the 2014 Real Estate Tax Summary for the property—the net tax assessed value percentage and the net mill rate—to make a more accurate calculation of Gifford's real estate tax escrow amount.

PHH challenges Gifford's claim as untimely under TILA. The crux of the parties' dispute regarding timeliness is whether Gifford's claim is subject to a one-year or a three-year statute of limitations period under 15 U.S.C. § 1640(e), which states:

> Except as provided in the subsequent sentence, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . Any action under this section with respect to any violation of section 1639, 1639b, or 1639c of this title may be brought in any United States district court, or in any other court of competent jurisdiction, before the end of the 3-year period beginning on the date of the occurrence of the violation.

PHH relies on the first sentence of this provision to support its contention that a one-year limitations period applies. Gifford relies on the three-year statute of limitations period provided for in the second sentence, arguing that PHH violated § 1639b (regarding residential

mortgage loan origination), § 1639c (regarding minimum standards for residential loans) and regulation 12 C.F.R. § 1026.19(e)(3)(iii), which she contends was promulgated pursuant to § 1639c. PHH replies that, as with her response to PHH's dismissal motion, Gifford has failed to cite any support for her contention that either of the statutory sections or the regulation govern her claim.

As PHH notes, the purpose of §§ 1639b and 1639c is "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2). Neither statutory section addresses how a creditor should estimate real estate taxes for the purposes of escrow. Section 1639b deals generally with the qualifications, registration, fees, and licenses of loan originators and grants the Consumer Financial Protection Bureau (CFPB) regulatory authority with respect to unfair lending practices. Although § 1639c at least mentions taxes, it discusses a creditor's obligation to make a reasonable and good faith determination that the consumer has a reasonable ability to repay the loan:

> **(a) Ability to repay**
>
> **(1) In general**
> In accordance with regulations prescribed by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments.
>
> \* \* \*
>
> **(3) Basis for determination**
>
> A determination under this subsection of a consumer's ability to repay a residential mortgage loan shall include consideration of the consumer's credit history, current income, expected income the

consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. A creditor shall determine the ability of the consumer to repay using a payment schedule that fully amortizes the loan over the term of the loan.

Gifford believes that PHH's failure to provide her with a good faith estimate of her real estate tax and escrow amount affected her ability to repay her loan. Duly noted. But Gifford has neither alleged nor presented any evidence that PHH failed to consider the required factors in determining her ability to repay the loan. In fact, the undisputed mortgage payments show that Gifford has never missed a mortgage payment.

Cutting against Gifford's position is § 1639d, which specifically regulates escrow accounts in consumer credit transactions:

**(h) Disclosures relating to mandatory escrow or impound account**

In the case of any impound, trust, or escrow account that is required under subsection (b), the creditor shall disclose by written notice to the consumer at least 3 business days before the consummation of the consumer credit transaction giving rise to such account or in accordance with timeframes established in prescribed regulations the following information:

\*     \*     \*

(3) The amount, in the initial year after the consummation of the transaction, of the estimated taxes and hazard insurance, including flood insurance, if applicable, and any other required periodic payments or premiums that reflects, as appropriate, either the taxable assessed value of the real property securing the transaction, including the value of any improvements on the property or to be constructed on the property (whether or not such construction will be financed from the proceeds of the transaction) or the replacement costs of the property.

> (4) The estimated monthly amount payable to be escrowed for taxes, hazard insurance (including flood insurance, if applicable) and any other required periodic payments or premiums.

*    *    *

Gifford has not responded to PHH's arguments concerning the applicability of § 1639d.

As I discussed in the court's November 19, 2018 order denying PHH's motion to dismiss, the Northern District of Georgia addressed a similar issue in a case in which a borrower alleged that his lender calculated his monthly escrow payment based on an old property tax bill, which reflected certain property tax exemptions that no longer were available, resulting in a "miscalculation" of the monthly mortgage payment. *Clarke v. Fid. Bank*, 2015 WL 11549240, at *2 (N.D. Ga. June 4, 2015), *rep. and rec. adopt. in part and rej. in part*, 2015 WL 11605377 (N.D. Ga. June 30, 2015). As in the instant case, the plaintiff in *Clarke* did not identify any specific provision of the TILA that his lender allegedly violated. The district court concluded that Clarke's claim was governed by § 1639d and subject to that section's one-year statute of limitations:

> For residential mortgage transactions, TILA requires creditors to disclose, among other things, the amount of "estimated taxes" for the mortgaged property in the initial year of the loan and the "estimated monthly amount" to be escrowed for such taxes. § 1639d(h)(3)-(4); *see also* 12 C.F.R. § 226.18(s)(3)(i)(C) (requiring disclosure of "an estimate of the amount of taxes" payable from each monthly payment to the escrow account). Generally, a private civil action for violation of TILA's disclosure requirements must be brought within one year of the alleged violation. 15 U.S.C. § 1640(e).
>
> *Id.*

I am persuaded by this reasoning, and in the absence of any contrary authority, I conclude that Gifford's claims regarding PHH's improper estimate of her property taxes and resulting escrow payment fall within the scope of § 1639d.

In a terse argument, Gifford states that she also may bring a claim under 12 C.F.R. §§ 1026.18 or 1026.19(e)(3)(iii). At the time that Gifford sought financing, § 1026.18(s)(3)(i) (C) (vers. eff. until Oct. 1, 2015) required lenders to make certain disclosures for mortgage transactions, including an estimate of the amount of taxes and insurance to be escrowed. Section 1026.19(e) required:

> (3) Good faith determination for estimates of closing costs.
>
> \* \* \*
>
>> (iii) Variations permitted for certain charges. An estimate of the following charges is in good faith if it is consistent with the best information reasonably available to the creditor at the time it is disclosed, regardless of whether the amount paid by the consumer exceeds the amount disclosed under paragraph (e)(1)(i) of this section:
>>
>> \* \* \*
>>
>> (C) Amounts placed into an escrow, impound, reserve, or similar account;
>>
>> (D) Charges paid to third-party service providers selected by the consumer consistent with paragraph (e)(1)(vi)(A) of this section that are not on the list provided pursuant to paragraph (e)(1)(vi)© of this section; and
>>
>> (E) Charges paid for third-party services not required by the creditor. These charges may be paid to affiliates of the creditor.

12 C.F.R. § 1026.19 (Dec. 30, 2011 to Oct. 2, 2015 version).

Although it appears that the regulations quoted above might capture the nature of Gifford's claim, Gifford has failed to meaningfully develop this argument. Moreover, Gifford has not cited any authority in support of her contention that the regulation was promulgated pursuant to § 1639c and therefore is subject to the same three-year statute of limitations as § 1639c. In fact, all of the provisions of 12 C.F.R. Part 1026 are known collectively as "Regulation Z." 12 C.F.R. § 1026.1(a); *Causey v. Sun W. Mortg. Co.*, 2017 WL 1190388, at *10 (C.D. Cal. Mar. 29, 2017), *aff'd sub nom.*, 740 Fed. Appx. 119 (9th Cir. 2018) (specifically identifying § 1026.19(e)(3)(iii) as part of Regulation Z). Federal courts addressing the issue have concluded that "Regulation Z, like most of TILA, is governed by a one-year statute of limitations." *Prescott v. PHH Mortg. Corp.*, 2017 WL 510449, at *4 (E.D. Va. Feb. 7, 2017), *aff'd*, 689 Fed. Appx. 769 (4th Cir. 2017). *See also CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015); *Carlos v. Beneficial Fin. I Inc.*, 2017 WL 5593317, at *4 (N.D. Ill. Nov. 21, 2017). Therefore, any claims that Gifford has under 12 C.F.R. §§ 1026.18 or 1026.19 also are barred by a one-year statute of limitations.

Finally, Gifford argues that she was not aware of the violation until sometime in January 2017, when she first received a letter advising her that her monthly payments were increasing to $1,116.40 on February 1. Even if I assume, *arguendo*, that Gifford's statute of limitations period began to accrue on February 1, 2017, this does not help her: Gifford did not file her lawsuit in state court until March 8, 2018, over a month after the expiration of her one-year limitations period. Although the defense of equitable tolling allows a court to toll a statute of limitations period under certain circumstances, Gifford has failed to propose any facts, submit any evidence, or develop a meaningful argument establishing that she exercised due diligence in

bringing her claims or that extraordinary circumstances beyond her control prevented her from timely bringing her claims. *See Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 964 (7th Cir. 2005) (Setting forth standard for equitable tolling, which is "used sparingly [and] reserved for those situations in which extraordinary circumstances prevent a party from filing on time."). Accordingly, Gifford's TILA claim will be dismissed as untimely.

## III. State Law Claims

All of Gifford's misrepresentation claims share the following required elements: (1) PHH must have made a representation of fact to Gifford; (2) the representation of fact must be false; and (3) Gifford must have believed and relied on the misrepresentation to her detriment or damage. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis. 2d 146, 157, 677 N.W.2d 233, 239. PHH contends that because Gifford bases her claims on PHH's *estimate* of her property taxes, she has not shown a representation of *fact* necessary to succeed on a claim for misrepresentation or deceptive trade practices. Although I rejected this argument when denying PHH's motion to dismiss, I noted that it was unlikely that Gifford would be able to show that an estimate provided to her by her lender was a factual representation. I gave Gifford the benefit of the doubt because it was not clear from the pleadings how PHH had represented the escrow amount to Gifford. Nov. 19, 2019 Ord., dkt. 23, at 16-18. The undisputed facts now before the court show that Gifford's claims of factual misrepresentation fail as a matter of law.

Federal district courts considering similar claims have determined that incorrect estimates of escrow amounts and other figures cannot constitute misrepresentations of fact if the

defendant clearly disclosed that the number in question was an estimate. *See Tietjen v. Ninneman*, 2017 WL 5634878, at *5 (E.D. Wis. Sept. 29, 2017) (no misrepresentation of fact about pension where Pension Estimate Form made clear that figure used was estimate); *Kirby v. Bank of Am.*, N.A., 2012 WL 1067944, at *10 (S.D. Miss. Mar. 29, 2012) ("This Court agrees that the Defendants clearly disclosed that the tax escrow amount was an estimate and thus it was not a misrepresentation."); *Abel-Malak v. JP Morgan Chase Bank, N.A.*, 748 F. Supp. 2d 505, 514 (D. Md. 2010) (holding that an escrow estimate during a real estate settlement was not false as a matter of law because it was explicitly deemed an estimate). For example, in *Kirby*, the district court reviewed the HUD-1 form on which plaintiffs based their misrepresentation claims and determined that "HUD-1 is simply a list of all the relevant charges related to the loan transaction and necessarily restates numbers that are derived from other features of the loan agreement." 2012 WL 1067944, at *10. Similarly, the court in *Abdel-Malak* found that "[p]laintiffs were aware that their escrow payment obligations were estimates which were subject to change," and "the escrow payments in [defendant's] statements were explicitly deemed 'estimates.'" 748 F. Supp. 2d at 514.

In this case, it is undisputed that PHH told Gifford several times prior to the closing that the tax escrow amount was an estimate:

- On January 29, 2015, Pond sent Gifford compliance disclosures that included a Good Faith Estimate. In a cover letter accompanying the disclosures, Pond informed Gifford that "[c]ertain fees on the GFE such as title charges, appraisal fees, and taxes are based on estimates and final charges may vary from scenario to scenario."

- On February 17, 2015, PHH sent Gifford a conditional commitment and endorsement of the loan, which listed "estimates" of the property's value and the monthly taxes.

17

- At the closing, key documents clearly identified the tax amount and escrow payments as estimates, including the Final Truth-In-Lending Disclosure and Initial Escrow Account Disclosure Statement. In addition, the HUD-1 Settlement Statement compared the good faith estimate concerning taxes and the escrow amount to the HUD charges and specifically stated in a footnote that the escrow payment could change.

A reasonable jury would conclude from the above evidence that PHH's statements to Gifford clearly disclosed that the tax escrow amount was merely an estimate and was subject to change.

Gifford makes the general statement that "[f]actual disputes exist as to what Gifford was told as to the taxes," but she has failed to identify the nature of those disputes. I assume that Gifford is referring to the parties' dispute over whether anyone ever explained to her how the estimate for her real estate taxes was calculated or cautioned her that it could change significantly. However, Gifford does not deny seeing the above documents that clearly describe the tax and escrow figures as estimates. In addition, a review of Gifford's response to PHH's proposed findings of fact and her supplemental proposed findings of fact shows that she failed to present any evidence about whether her tax or escrow amount was presented as an "estimate" or a "fact." Gifford's evidence focuses on how PHH calculated or should have calculated her tax estimate and mortgage payment.

I also am not persuaded by Gifford's conclusory argument that even though statements of opinion generally are not considered representations of fact, *Consolidated Papers, Inc. v. Dorr-Oliver, Inc.*, 153 Wis. 2d 589, 594, 451 N.W.2d 456, 459 (Ct. App. 1989) (distinguishing between facts and puffery), they may become actionable as misrepresentations if the speaker knew of facts incompatible with its opinion, *Lundin v. Shimanski*, 124 Wis. 2d 175, 192, 368 N.W.2d 676, 684 (1985). *Lundin* involved the purchase of a rental property in which Shimanski

told the Lundins that they would have no problem obtaining a permit to convert the basement of the property into a second unit, even though Shimanski was fully aware at that time that the city considered the second unit a violation and would not approve such a permit. *Id.*, 124 Wis. 2d at 194.

Although Gifford does not clarify her position, I assume that she is attempting to argue that PHH had "facts" in its possession regarding the property appraisal, the net tax assessed value percentage, and the net mill rate from which it should have derived a more accurate estimate for her property taxes. However, this additional information does not mean that PHH's tax estimate can be deemed a factual representation. Unlike in *Lundin*, PHH did not *know* that its tax estimate would be incorrect. For example, there is no evidence that PHH knew the actual amount of Gifford's taxes at the time of closing but withheld this fact.

I understand that Gifford believes that PHH should have relied on more precise figures or statistics that it had in its possession and taken greater care in calculating an estimate of her property taxes. Certainly it would have been easier for PHH's people than Gifford to dig deeper, run a few more scenarios, and come up with a higher estimate before the closing. I understand Gifford's palpable frustration at what she views as sandbagging by the bank that exacerbated her struggle to keep up with her mortgage payments. But none of this transforms PHH's property tax estimate into a fact. PHH clearly identified its tax estimate as such prior the closing and in the closing documents. Accordingly, PHH is entitled to summary judgment with respect to all of Gifford's state law misrepresentation claims.

Because Gifford's state law claims fail as a matter of law on this ground, it is unnecessary to address PHH's arguments regarding the economic loss doctrine or whether Gifford can be considered a member of the public.

ORDER

IT IS ORDERED that defendant PHH Mortgage Corporation's motion for summary judgment, dkt. 31, is GRANTED. The clerk of court is ordered to enter judgment in favor of defendant and close this case.

Entered this 4th day of June, 2019.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge